UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

OPERATING ENGINEERS' LOCAL 324
FRINGE BENEFIT FUNDS and TRUSTEES
OF THE OPERATING ENGINEERS' LOCAL
324 FRINGE BENEFIT FUNDS,

        Plaintiffs,           Case Number 20-10323
v.           Honorable David M. Lawson

RIETH-RILEY CONSTRUCTION
COMPANY, INC.,

        Defendant.
_____/

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO DISMISS, DISMISSING CASE WITHOUT PREJUDICE, AND DISMISSING OTHER PENDING MOTIONS**

        Collective bargaining agreements negotiated between employer associations and labor unions nearly always provide for fringe benefits (medical insurance, retirement benefits, and other employee welfare benefits) to be paid to workers by employers. The benefits typically are paid to and administered by a multi-employer trust fund, like the plaintiffs in this case. When an employer fails to make a fringe benefit payment, the law authorizes the trust fund to sue for collection. But the trust fund must choose the correct forum in which to bring its action.

        Under the Employee Retirement Income Security Act of 1974 (ERISA) and the Labor Management Relations Act (LMRA), the funds may sue in federal district court to enforce a CBA's fringe benefit contribution obligation against an employer. But to do so, there must be a live, enforceable contract in place. If, on the other hand, the employer's obligation arises by statute after a collective bargaining agreement expires, the place to sue is the National Labor Relations Board (NLRB), which has "exclusive jurisdiction" over such claims framed as unfair labor practices.

In this case, plaintiffs Operating Engineers' Local 324 Fringe Benefit Funds and the Trustees of the Operating Engineers' Local 324 Fringe Benefit Funds chose the first option, but they cannot point to an enforceable, live contract as the basis for their claims. They insist that defendant Rieth-Riley Construction Company manifested an intent to continue operating under an expired CBA, which it plainly did by, among other things, tendering fringe benefit payments on behalf of its employees. However, the plaintiffs refused to accept the payments and clearly and unequivocally rebuffed every attempt by the defendant to extend the contract while a new one could be negotiated. The defendant's obligation to maintain the status quo for fringe benefit contributions on behalf of its employees arises solely from the National Labor Relations Act (NRLA). The plaintiffs' remedy for any post-CBA failure to pay by the defendant, therefore, lies with the NLRB, where, apparently, they already have a case pending against Rieth-Riley. The defendant moves to dismiss the case in this Court alleging lack of subject matter jurisdiction. Because exclusive jurisdiction over the claim lies in the NLRB, the motion will be granted, and the case will be dismissed without prejudice.

I.

Defendant Rieth-Riley presents a factual attack on the Court's subject matter jurisdiction, which requires the Court to consider evidence beyond the pleadings. *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007). The following facts are taken from the complaint, motion papers, and exhibits, which the plaintiffs do not dispute, although they believe they are incomplete.

A.

Defendant Rieth-Riley Construction Company is a large road and highway construction contractor that employs a number of workers represented by Operating Engineers' Local 324.

Plaintiffs Operating Engineers Local 324 Fringe Benefit Funds are multiemployer trust funds established under Section 302 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185, to provide benefits to union-member employees under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001, *et seq.* The funds collect contractually mandated fringe benefit contributions from employers and pay medical expenses and pensions and provide training and other benefits for their participants and beneficiaries.

Rieth-Riley was a member of a trade group known as the Michigan Infrastructure and Transportation Association (MITA), which is comprised of hundreds of employers that hire Local 324's members to repair the state's roads. Sometime before 2013, Rieth-Riley signed a power of attorney that authorized MITA to negotiate with the union on its behalf. Consequently, as a POA Contractor, it became a party to a multiemployer collective bargaining agreement that MITA made with Local 324 on March 14, 2013, known as the Road Agreement. The CBA expired on May 31, 2018.

There were other MITA members that did not give power of attorney to MITA. Each of those non-POA contractors bargained directly with the union.

Rieth-Riley also entered into other agreements with Local 324 that derived from the CBA. On March 1, 2017, it entered into a Winter Maintenance Agreement, which specified that employees working under it were covered by the MITA CBA at reduced fringe benefit contribution rates compared to the CBA. That agreement expired on February 29, 2020. The parties also entered into market recovery agreements before June 2018, which enabled Rieth-Riley to avail itself of Local 324's market recovery program, allowing Rieth-Riley to pay reduced wages on certain projects.

The Road Agreement contained an evergreen clause (an automatic renewal provision), which MITA avoided by terminating the CBA when it expired in May 2018. Local 324 accepted MITA's termination and individually terminated the expired CBA as to "each and every" POA Contractor, including Rieth-Riley. MITA attempted to negotiate with Local 324 for a successor CBA. However, Local 324 withdrew from multiemployer bargaining with MITA and refused to negotiate with MITA or any of the POA Contractors.

B.

In addition to refusing to negotiate with MITA or any of the POA contractors, the Funds also refused to accept post-expiration fringe benefit contributions from any POA contractors because no contract existed between the contractors and the Funds that permitted or required the Funds to accept the contributions. The Taft-Hartley Act prohibits employer associations from making payments to employee groups such as unions. 29 U.S.C. § 186(a). And the Landrum-Griffin Act forbids payments to union-related entities unless the payments are "for the sole and exclusive benefit" of union members, and then only if the payments go into a trust fund jointly administered by employer and union management, and the "detailed basis on which such payments are to be made is specified in a written agreement with the employer." 29 U.S.C. § 186(c)(5)(B). Likewise, ERISA does not authorize contributions to a union welfare benefits plan except under a written agreement. 29 U.S.C. § 1145.

The Funds continued to accept post-expiration contributions from contractors who did not have powers of attorney with MITA because the Funds believed that they and the non-POA contractors intended to be bound by the expired CBA while a new agreement was negotiated. Some of those non-POA contractors had already signed a new agreement, while the remaining non-POA contractors who were in the process of forming a new contract were allowed to continue

making contributions while they negotiated for a successor agreement. The Funds' refusal to accept contributions from the POA Contractors resulted in separate litigation in this district by plan participants employed by POA Contractors who believed that the Funds' adherence to Local 324's preference for non-POA contractors violated the trustees' fiduciary duties. *See Thompson v. Stockwell*, No. 18-12392 (E.D. Mich. 2018).

During this time, Rieth-Riley says that it "fought hard to force the Funds to accept its post-expiration contributions — and the Funds fought just as hard to refuse them." In July 2018, Rieth-Riley and the other POA contractors offered to enter into an "Assent of Participation" agreement with the Funds, which would have allowed the POA contractors to "participate and remain a party in the same manner and form as any other participating employer." The Funds' Board of Trustees never approved the agreement and the Funds rejected the offer, believing that the Assent of Participation was "unilaterally created by MITA" and did therefore did not create independent contractual contribution obligations. Rieth-Riley never withdrew the offer, although the Funds never accepted it, and the Assent of Participation never was signed.

Believing that the powers of attorney presented the main obstacle to the POA contractors' efforts to negotiate a successor CBA, in August 2018 MITA revoked all powers of attorney with the POA contractors, including Rieth-Riley. The union still rejected the POA contractors' negotiation attempts. Rieth-Riley then tried to rescind its power of attorney with MITA. The union rejected that as well and continued to block the Funds from accepting and crediting fringe benefit contributions from contractors who had rescinded powers of attorney with MITA.

From June 2018 through August 2020, Rieth-Riley tried to pay fringe benefit contributions to the Funds, but the Funds rejected the attempts until October 2018, when the parties learned that the Funds were statutorily obligated to accept the contributions. With each fringe benefit

contribution, Rieth-Riley filed separate fringe benefit reports, which stated the names of employees, the hours they worked, and the wages they earned. The reports included the following boilerplate language above the signature lines:

> \*\* IMPORTANT\*\*
> . . .
> By filing this report, the above-named Employer certifies the accuracy of information of the report and agrees to be bound by all terms of payment to the forgoing named Funds, as set forth in the current applicable Collective Bargaining Agreements between Operating Engineers Local 324 and Employer Associations, and to all the terms of the Trust Agreements of these funds.

C.

In October 2018, the parties realized that their relationship was governed by section 9(a) of the NRLA, 29 U.S.C. § 159(a). Their earlier misunderstanding that section 8(f) controlled was understandable; that section is commonly implemented in this field because it creates an exception for construction industry workers that allows an employer in the construction industry to enter into a labor agreement with less than a majority of employees authorizing the union's representation. 29 U.S.C. § 158(f); *see DiPonio Const. Co. v. Int'l Union of Bricklayers & Allied Craftworkers, Local 9*, 739 F. Supp. 2d 986, 990 (E.D. Mich. 2010), *aff'd,* 687 F.3d 744 (6th Cir. 2012) (citing *Strand Theatre of Shreveport Corp. v. NLRB,* 493 F.3d 515, 518 (5th Cir.2007)). Of significance here, when a section 8(f) agreement expires, the parties have no obligation to bargain with one another for a new agreement. *DiPonio*, 739 F. Supp. 2d at 990 (citing *Strand Theatre*, 493 F.3d at 518; *Nova Plumbing, Inc. v. NLRB*, 330 F.3d 531, 534 (D.C. Cir. 2003)). By contrast, under section 9(a), which governs most other labor agreements, when a CBA expires employers are obliged to maintain the status quo and to bargain in good faith with a union that has been "designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes." 29 U.S.C. § 159(a).

Once Rieth-Riley produced evidence of the section 9(a) relationship with Local 324, the Funds immediately began accepting Rieth-Riley's post-expiration contributions. From that point forward, the parties have understood that Rieth-Riley's post-expiration contribution obligations arise solely from Rieth-Riley's statutory status quo obligations under federal labor law.

The Funds continued to defend their refusal to accept post-expiration contributions from the other POA contractors because, unlike the situation with Rieth-Riley, the Funds were not statutorily obligated to accept the contributions. The Funds began accepting contributions from other POA contractors with section 8(f) relationships only when those contractors individually entered into either a new CBA with Local 324 or a Memorandum of Understanding.

Because Rieth-Riley had a section 9(a) relationship with the funds, it never entered into another contract with Local 324 or the Funds. The parties are still negotiating a new CBA, as required under the NLRA. Since discovering its section 9(a) relationship with Local 324, Rieth-Riley has continued to make, and the Funds have continued to accept, Rieth-Riley's contributions.

D.

The Funds now maintain that Rieth-Riley complied with its statutory obligations only until July 2019. After July 31, 2019, they say, Rieth-Riley paid fringe benefit contributions on only some of its employees performing work under the expired CBA and did not pay contributions for other employees. On October 1, 2019, the Funds requested an audit of Rieth-Riley's payroll records for its Michigan locations from 2016 to the present. Rieth-Riley produced some records, but the Funds allege that it "failed to produce any records for other employees who performed work covered by the [CBA], including strike replacements," and "failed to produce records requested of subcontracts, information about jobs and equipment used on them, Federal and

Michigan tax forms, payroll records of all employees and even the identities of all employees operating equipment covered under the [CBA]."

The Funds commenced this action on February 7, 2020, under section 502 of ERISA, 29 U.S.C. § 1132, and Section 301 of the LMRA, 29 U.S.C. § 185. They ask the Court for an order compelling Rieth-Riley to produce its books and records, pay all fringe benefit contributions determined to be owed, and award interest, attorney's fees, and other miscellaneous relief.

The parties currently are litigating Rieth-Riley's post-CBA-expiration contributions before the NLRB. In its motion to dismiss, Rieth-Riley contends that is where the entire dispute belongs, because that forum has exclusive jurisdiction over the claims for the disputed fringe benefit contributions, which arise exclusively from its statutory obligations and not from any contract.

II.

Rieth-Riley filed its motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), alleging "lack of subject matter-jurisdiction." A motion under Rule 12(b)(1) may be brought as a facial attack — that is, a challenge to the sufficiency of the complaint — or a factual attack — taking in evidence beyond the pleadings. *Cartwright v. Garner*, 751 F.3d 752, 759 (6th Cir. 2014). For the latter, courts have "wide discretion" to consider affidavits and documents "to arrive at the factual predicate that subject-matter jurisdiction does or does not exist." *Gentek Bldg. Prods.*, 491 F.3d at 330. The Court also may take judicial notice of its own records. *See* Fed. R. Evid. 201(b)(2*); United States v. Doss*, 563 F.2d 265, 269 n. 2 (6th Cir. 1977). The plaintiffs have the burden to prove the jurisdictional facts, *Cartwright*, 751 F.3d at 760, and all parties have had the opportunity to present evidence on that issue. The Court "has the power to weigh [that] evidence and determine the effect of that evidence on the court's authority to hear the case." *Id*. at 759-60.

It is well established that, although ERISA allows a court to enforce contractual obligations, a district court lacks subject-matter jurisdiction to enforce a statutory "duty to make postcontract contributions while negotiations for a new contract are being conducted." *Laborers Health and Welfare Trust Fund for N. Cal. v. Advanced Lightweight Concrete Co., Inc.,* 484 U.S. 539, 547-51 (1988) (stating that "[t]he legislative history of [ERISA's enforcement] provisions explains that Congress added these strict remedies[, which include mandatory prejudgment interest, liquidated damages, and attorney's fees,] to give employers a strong incentive to honor their contractual obligations to contribute and to facilitate the collection of delinquent accounts" and "[t]hat history contains no mention of the employer's statutory duty to make postcontract contributions while negotiations for a new contract are being conducted"). ERISA "does not confer jurisdiction on district courts to determine whether an employer's unilateral decision to refuse to make postcontract contributions constitutes a violation of the NLRA." *Id.* at 549.

The same is true for claims under the LMRA. Section 301(a) of the LMRA, 29 U.S.C.§ 185(a), "provides a federal forum for suits to enforce labor contracts, including pension and welfare fund agreements." *Schneider Moving and Storage Co. v. Robbins*, 466 U.S. 364, 366 n.2 (1984). However, "section 301 has no application in the absence of a currently effective [CBA]." *Derrico v. Sheehan Emergency Hosp.*, 844 F.2d 22, 25 (2d Cir. 1988), *cited with approval in Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 206 (1991) (holding that "[s]ection 301 of the LMRA, 29 U.S.C § 185, does not provide for federal court jurisdiction where a bargaining agreement has expired, although rights and duties under the expired agreement 'retain legal significance because they define the status quo' for purposes of the prohibition on unilateral changes.").

The existence of a live contract, therefore, is an essential jurisdictional fact that the Court must determine before proceeding further. It is not a question that is confounded with a merits issue. *Compare Weigandt v. Farm Bureau Gen. Ins. Co.*, 54 F. Supp. 3d 756, 760 (E.D. Mich. 2014) (citing *Primax Recoveries, Inc. v. Gunter*, 433 F.3d 515, 518-19 (6th Cir. 2006)).

The parties in this case do not dispute any of the facts or the fundamental principles of law discussed above. The plaintiffs concede that the CBA in this case expired, that they expressly declined to revive the CBA, and that absent an enforceable contract, the Court lacks jurisdiction over the action. However, the plaintiffs defend their complaint on three grounds: (1) the parties impliedly agreed to revive the CBA; (2) even if they did not revive the CBA, the defendant is still bound to abide by the Trust Agreements and other ancillary agreements; and (3) the defendant's motion is premature, and the Court should wait until the parties exchange discovery to consider the arguments.

A.

Courts have found jurisdiction under ERISA for a benefit fund contribution collection action when the parties' conduct manifested an intent to be bound by an expired CBA. *See Michigan Bricklayers v. Nw. Constr., Inc.*, Nos. 95-2379, 96-1346, 1997 WL 351296 (6th Cir. June 23, 1997). The Funds argue, therefore, that the critical issue in this case is whether Rieth-Riley exhibited an intent to adopt or agree to the expired Road Agreement. But that is not quite accurate.

Federal courts must apply federal common law to determine whether a collective bargaining agreement has been reached. *Sheet Metal Employers Indus. v. Absolut Balancing Co.*, 830 F.3d 358, 362-63 (6th Cir. 2016). It is true that "a 'collective bargaining agreement is not an ordinary contract,' and '[t]he rule is well established that technical rules of contract do not control

- 10 -

whether a collective bargaining agreement has been reached.'" (quoting *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 550, (1964); *Pepsi–Cola Bottling Co. of Mason City, Iowa v. NLRB*, 659 F.2d 87, 89 (8th Cir. 1981)). However, "[a] meeting of the minds of the parties must occur before a labor contract is created." *Bobbie Brooks, Inc. v. Int;l Ladies' Garment Workers Union*, 835 F.2d 1164, 1168 (6th Cir. 1987) (citing *Interprint Co.*, 273 NLRB 1863 (1985)); *see also Trs. of Mich. Reg'l Council of Carpenters Emp. Benefits Fund v. Fox Brothers Co.*, No. 05-70262, 2005 WL 8155051, at *11 (E.D. Mich. May 23, 2005) ("Collectively bargained agreements emerge as the result of mutual assent and not legal compulsion") (citing *H.K. Porter Co. v. NLRB*, 397 U.S. 99, 108 (1970)). A writing is not necessary to form or extend a CBA; "it can be shown by conduct manifesting an intention to abide by agreed-upon terms." *Bobbie Brooks*, 835 F.2d at 1168. But a meeting of the minds is essential. *Ibid.*

There is no question that Rieth-Riley expressed a desire to extend and operate under the expired CBA. The defendant attempted to continue to pay fringe benefit contributions immediately after the CBA expired, it rescinded its power of attorney with MITA so it could bargain individually with the union, and it offered its "Assent of Participation" so it could "remain a party [to the CBA] in the same manner and form as any other participating employer." And its conduct at that time cannot be referable to its intention to fulfill its obligation under Section 9(a) to maintain the status quo, because it took those action before it realized it has a section 9(a) agreement with the union. Those facts are undisputed.

But in its attempt to continue operating under the expired CBA with Local 324, Rieth-Riley was an unrequited suitor. There are no facts in this record suggesting even remotely that Rieth-Riley's desire to continue under the expired Road Agreement with the union was mutual. To the contrary, all the evidence demonstrates the union's unequivocal rejection of that offer. In fact, the

plaintiffs have never asserted — in their response brief or in their complaint — that *their* conduct manifested an intent to be bound by the CBA; they focus entirely on the defendant's conduct. And the record reflects (and the plaintiffs concede) that they refused to renegotiate a CBA with MITA or Rieth-Riley, rejected the "Assent of Participation" as "unilaterally created by MITA," rejected both MITA's and Rieth-Riley's attempts to bargain after rescinding their powers of attorney, and rejected all of Rieth-Riley's attempts to contribute to the fund until Rieth-Riley informed them that they were statutorily obligated to accept the contributions under the NLRA.

The plaintiffs rely heavily on *Michigan Bricklayers v. Northwest Construction, Inc*. In that case, the court of appeals found that the employer's conduct demonstrated an intent to continue to be bound by an expired CBA, and not merely to maintain the status quo under section 8(a)(5), because the employer "took actions that its duty to maintain the status quo did not require," including increasing payroll deductions as called for by a new but yet unsigned agreement, and submitting contributions on the form referencing the CBA. 1997 WL 351296, at *2. The dissenting judge disagreed because she believed that the evidence was uncontroverted that the union refused to be bound by the expired CBA. *Id.* at *3 (Beckwith, J., dissenting). However, there also was evidence in the record that union officials said that they would have pulled workers off the job if they believed that the employer would not comply with the expired CBA. That was a sufficient indication for the majority to affirm the district court's determination that the parties mutually assented to extend the agreement. *Id.* at *3.

There is no such evidence in this case. It is true that after the CBA expired, Rieth-Riley continued to submit fringe benefit reports that included boilerplate language referencing "the current applicable Collective Bargaining Agreements." But the plaintiffs actually rejected the contributions and reports until they discovered they were statutorily obligated to accept

contributions under the NLRA. And once the Funds began accepting the contributions, Rieth-Riley's compliance with the statutory status quo obligations did not create an implied contract. *See Smith v. Candler Coffee Corp.*, No. 95-1095, 1996 WL 434554, at *4 (S.D.N.Y. Aug. 2, 1996) (noting that if mere compliance with the NLRA's status quo obligations created an implied CBA, an employer would always face the "Hobson's choice" of "violat[ing] the law by halting contributions, or . . . creat[ing] an implied contract by continuing those contributions."); *see also Dugan v. R.J. Corman R. Co.*, 344 F.3d 662, 669 (7th Cir. 2003) (noting that because under section 9(a), the employer "was obligated by the National Labor Relations Act to maintain the status quo, and the status quo included making contributions required by the expired collective bargaining agreement" "[i]t follows that the continued contributions may not even have been voluntary on [the employer]'s part, and if they were involuntary they certainly were not an acknowledgment of a contractual obligation"). After all, it is not Rieth-Riley's conduct that is critical for the determination of a jurisdictional foothold in this case; it is the plaintiffs', and the union's.

It is disingenuous for the plaintiffs to argue that Rieth-Riley was submitting fringe benefit contributions under the expired CBA once the parties discovered their 9(a) relationship. The plaintiffs expressly denied doing so (after receiving the reports), both to Rieth-Riley and to the Court in hearings in the *Thompson* litigation. *Thompson* Hr'g Tr. Re: Various Mots., ECF No. 19-16, PageID.322 ("So, these employers, with 9(a) relationships, are operating under maintaining the status quo under the terminated agreement. And the Funds are obligated to accept because that's what the [NLRA] says."). On this record, the plaintiffs cannot establish that the parties mutually assented to enter into a new CBA (express or implied) or extend the old one, nor do they even argue that the union intended to do so.

Without a valid contract, the Court lacks jurisdiction over the case, which more properly is viewed as an unfair labor practice claim, over which the NLRB has exclusive jurisdiction. *Advanced Lightweight*, 484 U.S. at 546. And although the plaintiffs insist that they have not initiated an unfair labor practice claim, that contention is contradicted by the fact that the Funds are currently litigating Rieth-Riley's allegedly deficient contributions before the NLRB. *See* Mot. Dismiss, ECF No. 19, PageID.167 n.3

B.

Alternatively, the plaintiffs argue that Rieth-Riley's obligations to the funds exist through other written agreements than the expired CBA. They point to the Winter Agreement, the various Trust Agreements, and the Assent of Participation. Federal courts can "enforce contractual obligations to contribute . . . established by independent, unexpired trust and participation agreements, which, by their terms, extend beyond the expiration of a CBA." *Cent. States, Se. and Sw. Areas Pension Fund v. Behnke*, 883 F.2d 454 (6th Cir. 1989). In *Behnke*, the employer signed an "interim" contribution agreement during the negotiation period for a new CBA after the underlying agreement expired. *Id.* at 456-57. The *Behnke* court found that the interim agreement served as an independent contractual basis to hold the defendant liable under ERISA. *Id.* at 464.

Rieth-Riley never signed an interim agreement of the sort that bound the employer in *Behnke*. The ancillary agreements in this case resemble more those considered in *Central States, Southeast & Southwest Areas Pension Fund v. General Materials, Inc.*, 535 F.3d 506 (6th Cir. 2008). In that case, the employer was a party to both a collective bargaining agreement and a participation agreement, which were signed on the same day. *Id.* at 509. The employer terminated the CBA by notifying the union but failed to inform the fund, and the employer continued to contribute to the fund for only two of its employees. *Ibid.* The fund subsequently sued for unpaid

contributions related to the other employees, but the Sixth Circuit rejected the fund's argument that the employer was independently bound by a participation agreement after the collective bargaining agreement had expired. *Id.* at 509-10. The court distinguished *Behnke* on the ground that the employer in that case signed an interim agreement after the initial CBA had expired. *Ibid.* The court held that the participation agreement, which was signed contemporaneously with the CBA, terminated with the expiration of the underlying CBA, and the failure to give notice to the fund as required by the participation agreement was inconsequential. *Id.* at 509.

In this case, both the Winter Agreement (signed on March 1, 2017) and Trust Agreements (signed in December 2005) were signed before the expiration of the CBA in 2018. Like the agreement in *General Materials*, the Winter and Trust Agreements "cannot be understood apart from the" underlying CBA. *Gen. Materials*, 535 F.3d at 509. The Winter Agreement specified the contribution rates under the CBA between the plaintiffs and MITA, and the Trust Agreements define who are covered by the CBA and requires employers to comply with the policies and procedures of the Funds. Thus, "after the . . . CBA expired, [the Winter and Trust Agreements] became incognizable." *Ibid.*

That leaves the Assent of Participation that Rieth-Riley offered in July 2018, which would have allowed it to "remain a party [to the CBA] in the same manner and form as any other participating employer." Assent of Participation, ECF No. 19-21. But unlike the interim agreement in *Behnke*, Rieth-Riley's Assent of Participation was never signed, nor did the Funds ever agree to it. *Compare Behnke*, 883 F.2d at 461.

The plaintiffs raise two points that indirectly suggest that they could have assented to the participation agreement. First, although they conceded that "[t]he Funds did not accept [Rieth-Riley's] Assent of Participation as a contractual obligation," they point to Fund Director Lalonde's

declaration that "to [his] knowledge MITA never withdrew it." Lalonde Decl., ¶9 ECF No. 25-2, PageID.716. But they do not develop this argument by asserting, for example, that the Funds expressly or impliedly accepted the Assent of Participation. In fact, during the *Thompson* litigation, they took the opposite position. The plaintiffs argued that the Assent was unenforceable because it was "unilaterally created by MITA." Local 324's Mot. for Evid. Hr'g in *Thompson*, ECF No. 19-22, PageID.483 n.3. And during oral argument in that case, they maintained that "[the] use of such 'Participation' agreements in these circumstances has never been approved or authorized by the Funds' Board of Trustees," *ibid.*, and the Funds have "no policies, procedure[s], [or] past practice of accepting a participation agreement or letter of assent as a basis of contributing to the funds." *Thompson* Hr'g Tr. Re: Various Mots., ECF No. 19-16, PageID.316.

The plaintiffs contend that their representations in the *Thompson* litigation are irrelevant here because the "case addressed the Funds' obligation to accept contributions at a particular point in time after expiration of the collective bargaining agreement," not the Funds' right to enforce a full measure of contributions under ERISA and the LMRA after Rieth-Riley's payments were accepted. But the plaintiffs do not explain how that distinction matters. The representations are certainly relevant to illuminate the union's intent, or lack thereof, to engage in a contractual relationship with the defendant. The representations made during the 2018 litigation may not reflect the Funds' *current* intent to enter into a contractual relationship. But as is, the record reflects that the Funds rejected all attempts to enter into a contract with Rieth-Riley after the 2018 CBA expired, and the Funds do not even argue that they currently intend to accept as valid the unsigned and previously rejected Assent of Participation.

The plaintiffs also rely on *Santa Monica Culinary Welfare Fund v. Miramar Hotel Corp.*, 920 F.2d 1491, 1494 (9th Cir. 1990), in which the Ninth Circuit held that an employer was required

to submit to an audit, even though the parties' CBA provided that the employer's obligation to make a specified payment was the extent of its obligations to the employee benefits fund. *See also DeMarco v. C & L Masonry, Inc.,* 891 F.2d 1236, 1239-40 (6th Cir. 1989) (affirming the authority of the trustees to exercise their discretion to audit the employer under ERISA). But these cases are readily distinguishable because they both involve live, enforceable CBAs, unlike this case. The Funds have cited no authority to support the idea that Rieth-Riley can become contractually obligated to submit to an audit solely because it made non-contractual contributions that are required by statute.

C.

Finally, the plaintiffs argue that the defendant's motion to dismiss is premature because the record does not contain evidence that the Funds seek through discovery. Jurisdiction in this case hinges on the application of basic contract law principles, and the plaintiffs insist the Court needs more evidence to determine whether the parties impliedly entered into a contract enforceable in federal court under ERISA or the LMRA. The plaintiffs believe that they should have access to "the identity of employees performing work covered under the [CBA], hours worked and income earned, information about Rieth-Riley's subcontractors, and communications and documents related to Rieth-Riley's compliance with the expired [CBA]."

However, aside from the last item, the outstanding discovery pertains to the plaintiff's damages; it has no bearing on whether the parties impliedly entered into a contract that would permit the Court to exercise jurisdiction over the claim. The last item, which pertains to the defendant's compliance with the expired CBA, would be relevant if Rieth-Riley called into question its intention or desire to continue operating under the terms expired CBA. But that factual question is beyond doubt: it did. It is the plaintiffs' conduct with respect to the CBA that is

relevant. The Funds need no court-assisted discovery to show that they or the union had assented to the formation of a new CBA with Rieth-Riley. Moreover, the plaintiffs are not entitled to a "fishing expedition . . . to conduct discovery simply to make sure that [Rieth-Riley] did not engage in conduct that indicates an intent to be contractually bound" when it is undisputed that the Funds and union refused to form the contract. *Local 705 Int'l Bhd. of Teamsters Pension Fund v. Groot Recycling & Waste Serv., Inc.*, No. 15 C 2700, 2015 WL 5610949, at *3 (N.D. Ill. Sept. 22, 2015) (granting motion to dismiss for lack of subject matter jurisdiction under *Advanced Lightweight*). Not only is the record devoid of any evidence that the plaintiffs assented to the formation of a new CBA, the plaintiffs do not even argue that they had any desire to do so. Permitting discovery here will not inform the record about the jurisdictional question.

III.

There is no live, enforceable contract in place that can serve as a basis for the plaintiffs to maintain an action for collection of fringe benefit contributions from the defendant under ERISA or the LMRA. The undisputed facts on this record establish that the defendant's obligation to make such contributions arises, if at all, from the mandate in the NLRA to maintain the status quo during the interregnum between the expired CBA and the to-be negotiated successor. Any claim that the defendant has not made such contributions falls within the exclusive jurisdiction of the NLRB. This Court does not have subject-matter jurisdiction over the present dispute.

Accordingly, it is **ORDERED** that the defendant's motion to dismiss for want of jurisdiction (ECF No. 19) is **GRANTED**.

It is further **ORDERED** that the complaint is **DISMISSED WITHOUT PREJUDICE.**

It is further **ORDERED** that the motion to stay discovery (ECF No. 30), the motion for a default judgment (ECF No. 33), the motions to enforce subpoenas (ECF No. 35, 36), the motion

to extend the expert disclosure deadline (ECF No. 39), the motion to quash subpoenas (ECF No. 42), and the motion to suspend the case management schedule (ECF No. 59) are **DISMISSED as moot**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   February 4, 2021