UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

OPERATING ENGINEERS' LOCAL 324
FRINGE BENEFIT FUNDS and TRUSTEES
OF THE OPERATING ENGINEERS' LOCAL
324 FRINGE BENEFIT FUNDS,

               Plaintiffs,                       Case Number 20-10323
v.                                          Honorable David M. Lawson

RIETH-RILEY CONSTRUCTION
COMPANY, INC.,

               Defendant.

_____/

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, AND DISMISSING CASE WITH PREJUDICE

The plaintiffs, multiemployer trust funds established to collect and administer certain fringe benefit contributions paid by employers on behalf of union workers under collective bargaining agreements, have filed this lawsuit seeking to compel the defendant employer to submit to an audit. This case was previously before the Court on the defendant's motion to dismiss for want of subject matter jurisdiction. The Court determined then, based on permissible fact finding on a motion brought under Civil Rule 12(b)(1), that the plaintiffs' claims for an audit of the defendant's fringe benefit contributions arose from a statutory obligation, not from a contract, and therefore the claim must be presented to the National Labor Relations Board, which has exclusive jurisdiction over such matters under the National Labor Relations Act, not to a court under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001, *et seq.* (ERISA). The court of appeals reversed that decision, holding that the question of which statute governs is a merits determination, not a jurisdictional question. On remand, the parties have filed cross motions for summary judgment, which present the question whether there are facts in the record that

support the inference of a continued contractual relationship between the defendant employer and the labor unions under which the fringe benefits contributions were to be made to the plaintiff trust funds. The Court heard oral argument on June 21, 2023. The undisputed facts demonstrate what the Court previously determined: there is no continuing labor contract, and the defendant's conduct is unequivocally referrable to its statutory obligations. The plaintiffs, therefore, cannot prevail on their ERISA claims, and their complaint must be dismissed.

I.

The facts of the case are recited in the Court's earlier opinion on the defendant's motion to dismiss. *Operating Eng'rs' Loc. 324 Fringe Benefit Funds v. Rieth-Riley Constr. Co., Inc.*, 517 F. Supp. 3d 675, 678 (E.D. Mich. 2021), *rev'd and remanded*, 43 F.4th 617 (6th Cir. 2022), *cert. denied*, 143 S. Ct. 775 (2023). Although the parties since have taken additional discovery, their briefs recite largely the same facts and cite largely the same materials as their papers on the Rule 12(b)(1) motion. In fact, the defendant draws its statement of facts directly from the Court's opinion on the defendant's Rule 12(b)(1) motion, and the Court repeats some of those same facts here.

A. The Collective Bargaining Agreement

Defendant Rieth-Riley Construction Company is a large road and highway construction contractor that employs a number of workers represented by Operating Engineers' Local 324. Plaintiffs Operating Engineers Local 324 Fringe Benefit Funds are multiemployer trust funds established under Section 302 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185, to provide benefits to union-member employees under ERISA. The funds collect contractually-mandated fringe benefit contributions from employers, pay medical expenses and pensions, and provide training and other benefits for their participants and beneficiaries. They operate under Trust Agreements that establish their scope and certain legal rights and obligations; the agreements

for the six Funds are identical in all material respects.  *See* Trust Agreements, ECF No. 77-2 through 77-6.

Rieth-Riley was a member of a trade group known as the Michigan Infrastructure and Transportation Association (MITA), which is comprised of hundreds of employers that hire Local 324's members to repair the State's roads.  *See, e.g.*, Recission Letter, ECF No. 76-15, PageID.2943.  Sometime before 2013, Rieth-Riley signed a power of attorney (POA) that authorized MITA to negotiate with the union on its behalf.  *Ibid.*  Rieth-Riley consequently became a party to a multiemployer collective bargaining agreement that MITA made with Local 324 on March 14, 2013, known as the Road Agreement.  *See* Road Agreement, ECF No. 76-1, PageID.2494.  The Road Agreement required that employers make periodic fringe benefit contributions to the Funds at specified rates.  *Id.* at PageID.2521-24.  Other MITA members that did not give power of attorney to MITA bargained directly with the union.  *See* Aug. 10, 2018 Letter, ECF No. 76-3, PageID.2543.

On February 19, 2018, MITA notified Local 324 that it would terminate the Road Agreement effective June 1, 2018.  Termination Letters, ECF No. 76-2, PageID.2541.  The union accepted MITA's termination and withdrew from multiemployer bargaining with MITA.  *Id.* at PageID.2540; Aug. 10, 2018 Letter, ECF No. 76-3, PageID.2543.  Although MITA attempted to negotiate with Local 324 for a successor CBA, the union refused to negotiate with MITA or any other contractors that had given power of attorney to MITA (the "POA contractors").  *See* Termination Letters, ECF No. 76-2, PageID.2541; Jan. 2022 ALJ Decision, ECF No. 76-27, PageID.3293; Minutes of Jun. 2018 Local 324 Mtg., ECF No. 76-15, PageID.2948-49; Aug. 2018 Emails, ECF No. 76-5, PageID.2547.  The union determined that it would not engage in any multi-employer bargaining or enter into another multi-employer CBA.  *Ibid.*

After MITA terminated the Road Agreement, the Funds refused to accept post-expiration fringe benefit contributions from any POA contractors because no contract existed between the contractors and the Funds that permitted or required the Funds to accept the contributions. *Ibid.* The Taft-Hartley Act prohibits employer associations from making freestanding payments to employee groups such as unions. 29 U.S.C. § 186(a). And the Landrum-Griffin Act forbids payments to union-related entities unless the payments are "for the sole and exclusive benefit" of union members, and then only if the payments go into a trust fund jointly administered by employer and union management, and the "detailed basis on which such payments are to be made is specified in a written agreement with the employer." 29 U.S.C. § 186(c)(5)(B). Likewise, ERISA does not authorize contributions to a union welfare benefits plan except under a written agreement. 29 U.S.C. § 1145.

The Funds continued to accept post-expiration contributions from contractors who did not have powers of attorney with MITA because the Funds believed that they and the non-POA contractors intended to be bound by the expired CBA while a new agreement was negotiated. *See* Minutes of Jun. 2018 Local 324 Mtg., ECF No. 76-15, PageID.2948-49; Aug. 2018 Emails, ECF No. 76-5, PageID.2547-48; Aug. 2018 Counsel Email, ECF No. 76-7, PageID.2554. Some of those non-POA contractors had already signed a new agreement, and the remaining non-POA contractors who were in the process of forming a new contract were allowed to continue making contributions while they negotiated for a successor agreement. *Ibid.* The Funds' refusal to accept contributions from the POA contractors resulted in separate litigation in this district by plan participants employed by POA contractors who believed that the Funds' adherence to Local 324's preference for non-POA contractors violated the trustees' fiduciary duties. *See Thompson v. Stockwell*, No. 18-12392 (E.D. Mich. 2018).

- 4 -

Meanwhile, Local 324 decided to picket Rieth-Riley and two other contractors with whom it no longer had an active contract.  Jan. 2022 ALJ Decision, ECF No. 76-27, PageID.3293.  The picketing began on August 25, 2018, and on September 4, 2018, MITA and Rieth-Riley responded with a "defensive lockout."  *Id.* at PageID.3293-94.  These events spawned several unfair labor practice cases before the NLRB, including a complaint alleging that Rieth-Riley unlawfully used the lockout to force the union to engage in multiemployer bargaining, Case 07-CA-234085, and refused to provide the union with requested information regarding subcontractors and bargaining unit employees, Case 07-CA-261954; a complaint that the union wrongfully stated that it would not negotiate a successor CBA with a contractor that designated MITA as its bargaining representative, Case 07-CB-226531; and a complaint that a union picketer inflicted injury on a non-striking employee at a Rieth-Riley plant, Case 07-CB-247398.  *See* Jan. 2022 ALJ Decision, ECF No. 76-27, PageID.3294; Jul. 2022 ALJ Decision, ECF No. 76-28, PageID.3361.  Although the union and Rieth-Riley are parties to each of the NLRB proceedings, the Funds are not, nor have they made any claims for contributions or audits in any of the NLRB cases.  *See ibid*.; Def. Resp. to 2d Admissions Request, ECF No. 77-17, PageID.3934-36.

## B.  Fringe Benefit Contributions

After MITA terminated the Road Agreement, Rieth-Riley continued to make fringe benefit contributions to the Funds.  The Funds refused the contributions, returning every contribution made by Rieth-Riley between May and November 2018.  Return Letters, ECF No. 76-9, PageID.2562-65.  Each time they returned contributions, the Funds informed Rieth-Riley that they had "determined that there is no legal basis for accepting contributions without a written agreement between your Company and IUOE Local 324."  *Ibid.*  The Funds also informed Rieth-Riley that they would continue accepting contributions from contractors "in connection with contracts which have not terminated."  *Ibid.*

In July 2018, Rieth-Riley and the other POA contractors offered to enter into an "Assent of Participation" agreement with the Funds, which would have allowed the POA contractors to "participate and remain a party in the same manner and form as any other participating employer." Assent Letter, ECF No. 76-13, PageID.2747.  The Funds' Board of Trustees never approved the agreement, and the Funds rejected the offer, believing that the Assent of Participation was "unilaterally created by MITA" and therefore did not create independent contractual contribution obligations.  The Board also asserted that the Funds never had approved or authorized the use of such agreements.  Local 324's Mot. for Evid. Hr'g in *Thompson*, ECF No. 76-14, PageID.2771 n.3.  Rieth-Riley never withdrew the offer, although the Funds never accepted it, and the Assent of Participation never was signed.  LaLonde decl., ¶ 8, ECF No. 77-11, PageID.3665-66.

Believing that the powers of attorney presented the main obstacle to the POA contractors' efforts to negotiate a successor CBA, in August 2018 MITA revoked all powers of attorney with the POA contractors, including Rieth-Riley.  Aug. 2018 MITA Letter, ECF No. 76-6, PageID.2552.  The union continued to reject the POA contractors' negotiation attempts.  *Ibid.* Rieth-Riley then tried to rescind its power of attorney with MITA.  MITA Recission Letter, ECF No. 76-16, PageID.2953.  The union rejected that as well and continued to block the Funds from accepting and crediting fringe benefit contributions from contractors who had rescinded powers of attorney with MITA.  Aug. 2018 MITA Letter, ECF No. 76-6, PageID.2552.

Despite the union's refusals, Rieth-Riley continued paying fringe benefit contributions to the Funds at least through October 2022.  LaLonde 2020 decl., ¶ 9, ECF No. 77-11, PageID.3666; LaLonde 2022 decl., ¶ 4, ECF No. 77-12, PageID.3671.  With each fringe benefit contribution, Rieth-Riley filed separate fringe benefit reports, which stated the names of employees, the hours

they worked, and the wages they earned. *Ibid.* The reports included the following boilerplate language above the signature lines:

** IMPORTANT**
. . .

By filing this report, the above-named Employer certifies the accuracy of information of the report and agrees to be bound by all terms of payment to the forgoing named Funds, as set forth in the current applicable Collective Bargaining Agreements between Operating Engineers Local 324 and Employer Associations, and to all the terms of the Trust Agreements of these funds.

Benefit Reps., ECF Nos. 77-13 through 77-15 (benefit reports filed between October 2020 and September 2022); *see also* ECF Nos. 27-3 through 27-9 (benefit reports filed between June 2018 and September 2020).

C. Status Quo Relationship

In October 2018, the parties realized that their relationship was governed by section 9(a) of the NRLA, 29 U.S.C. § 159(a), and not by section 8(f), as they previously believed. *See* Oct. 2018 Letter, ECF No. 76-17, PageID.2955; 1993 Recognition Agreement, ECF No. 76-18, PageID.2959. Their earlier misunderstanding that section 8(f) controlled was understandable; that section is commonly implemented in this field because it creates an exception for construction industry workers that allows an employer in the construction industry to enter into a labor agreement with less than a majority of employees authorizing the union's representation. 29 U.S.C. § 158(f); *see DiPonio Const. Co. v. Int'l Union of Bricklayers & Allied Craftworkers, Loc. 9*, 739 F. Supp. 2d 986, 990 (E.D. Mich. 2010) (citing *Strand Theatre of Shreveport Corp. v. NLRB*, 493 F.3d 515, 518 (5th Cir. 2007)), *aff'd*, 687 F.3d 744 (6th Cir. 2012). Of significance here, when a section 8(f) agreement expires, the parties have no obligation to bargain with one another for a new agreement. *DiPonio*, 739 F. Supp. 2d at 990 (citing *Strand Theatre*, 493 F.3d at 518; *Nova Plumbing, Inc. v. NLRB*, 330 F.3d 531, 534 (D.C. Cir. 2003)). By contrast, under section 9(a), which governs most other labor agreements, when a CBA expires, employers are obliged to

maintain the status quo and to bargain in good faith with a union that has been "designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes." 29 U.S.C. § 159(a).

Soon after Rieth-Riley produced evidence of the section 9(a) relationship with Local 324 in October 2018, the Funds began accepting Rieth-Riley's post-expiration contributions. *See* Mot. Hr'g Tr. in *Thompson*, ECF No. 76-10, PageID.2611; Oct. 2018 Letter, ECF No. 76-26, PageID.3288; Jan. 2022 ALJ Decision, ECF No. 76-27, PageID.3322. The Funds stated that the contributions were accepted because "[w]e have a 9(a) relationship" and "must maintain the status quo that was in effect prior to the termination of the agreement" even though "the parties have not negotiated a successor agreement." Mot. Hr'g Tr. in *Thompson*, ECF No. 76-10, PageID.2611-12. The Funds continued to defend their refusal to accept post-expiration contributions from the other POA contractors on the grounds that the Funds were not statutorily obligated to accept those contributions. *Id.* at PageID.2612-13. They began accepting contributions from other POA contractors with section 8(f) relationships only when those contractors entered into either a new CBA with Local 324 or a Memorandum of Understanding. *See, e.g.*, Ajax Letter, ECF No. 76-22, PageID.3252; Ajax Benefit Contributions, ECF No. 76-21, PageID.3249 (indicating that "pre-'M.O.U.' checks [were] returned").

Because Rieth-Riley had a section 9(a) relationship with the funds, it never entered into another contract with Local 324 or the Funds. As of the time of the motion hearing in this case, the parties were still negotiating a new CBA, as required under the NLRA. Since discovering its section 9(a) relationship with Local 324, Rieth-Riley has continued to make, and the Funds have continued to accept, Rieth-Riley's fringe benefit contributions, at least through October 2022. LaLonde 2022 decl., ¶ 4, ECF No. 77-12, PageID.3671.

D.  Audit Request

On October 1, 2019, the Funds requested an audit of Rieth-Riley's payroll records for its Michigan locations.  Audit Letter, ECF No. 77-10, PageID.3663.  The Funds requested records for certain locations dating back to January 2016 or 2017 (Ada, Charlevoix, Lansing), and for others dating back to June 2018 (Benton Harbor, Big Rapids, Prudenville).  *Ibid*.

The Funds made the request under their Trust Agreements, which define employers' obligations to make contributions to the Funds under collective bargaining agreements and establish procedures for enforcing those contributions.  *See, e.g.*, Pension Fund Agreement, ECR No. 77-2, PageID.3437-45.  The agreements also require employers to produce records for audit at the demand of the Funds.  Each agreement states that

> [e]ach Employer shall promptly furnish to the Trustees on request, or upon established periodic intervals, any and all records concerning the classification of his/her Employees, their names, social security numbers, amounts of wages paid and hours worked and any other payroll records and information that the Trustees may request in connection with the administration of the Trust Fund and Pension Plan and for no other purpose.  The Trustees or their authorized representative may examine the payroll books and other relevant records of each Employer whenever such examination is deemed necessary or advisable by the Trustees in connection with the proper administration of the Trust and the collection of Contributions claimed to be due or past due from such Employer.

*See, e.g.*, *id.* at Art. VII, Sec. 1, PageID.3445.  The Trust Agreements define "employer" to include "any . . . Employer engaged in work coming within the jurisdiction of the Union who contributes to the Trust Fund or who is obliged by a collective bargaining agreement, or other written agreement, to make Contributions to the Trust Fund."  *Id.* at PageID.3437.  They also require employers to comply with "any policy and/or procedure adopted by the Trustees from time to time regarding the enforcement and collection of Contributions, in addition to all other contractual and legal remedies available to the Trustees."  *Id.* at Art. VII, Sec. 2, PageID.3446.

The audit provisions of the Trust Agreements are supplemented by the Payment of Employer Contributions and Audit Procedures the Funds adopted on December 10, 2018. Payment Policy, ECF No. 77-8, PageID.3611-15. The policy specifies that the Funds shall audit employers "for the purpose of verifying the accuracy of contributions paid to the Funds and for any other purpose deemed appropriate to further the Funds' Trustees' performance of their duties." *Id*. at 3613. It also authorizes the Funds to "select an Employer for audit at any time," and requires employers to furnish on request "all records," including "documents reflecting the payment of wages, fringe benefit contributions and any amounts paid to subcontractors, as well as the number of hours worked by employees or other persons performing work for the Employer." *Ibid.*

According to the Funds, Rieth-Riley produced some of the records they demanded in the October 1, 2019 audit request, but not all of them. Missing are "records requested of subcontractors, information about jobs and equipment used on them, Federal and Michigan tax forms, payroll records of all employees and even the identities of all employees operating equipment covered under the Road Agreement." Pl.'s Mot. Summ. J., ECF No. 77, PageID.3422-23; *see also* Nichols decl., ECF No. 77-16, PageID.3930-31. The Funds maintain that Rieth-Riley owes them a better explanation of which employees' records are included in the information Rieth-Riley already produced. They also suggest that Rieth-Riley used management employees "from 2017 and possibly after" to operate machinery covered under the Road Agreement and may owe the Funds contributions corresponding to any hours they worked. *Id.* at PageID.3423. However, the Funds' director, Tim LaLonde, stated in a declaration that Rieth-Riley "began not paying fringe benefit contributions for all employees," such as strike replacements, "[a]t some point after August 1, 2019." LaLonde 2020 decl., ¶ 18, ECF No. 77-11, PageID.3668. LaLonde further states that "from June 1, 2018 to June 31, 2019, the Funds had no reason to believe that Rieth-Riley was not

paying fringe benefit contributions for all of its employees performing work under the Road Agreement." *Ibid.*

The Funds served interrogatories asking Rieth-Riley to state the criteria it used to determine the employees for which it has or will make contributions to the Funds, and for whom it has produced information pursuant to the audit request. *See* Def. Answers to 2d Interrog., ¶¶ 10-12, ECF No. 77-18, PageID.3950-53. Rieth-Riley objected, contending that the Funds cannot prove that they contractually are entitled to an audit. *Ibid.*

### E. The Lawsuit

The Funds commenced this action on February 7, 2020 under Section 502 of ERISA, 29 U.S.C. § 1132, and Section 301 of the LMRA, 29 U.S.C. § 185. Their amended complaint states that Rieth-Riley "maintains indebtedness to the Funds for work performed by its employees from August 1, 2019 onward," when Rieth-Riley "began selectively paying contributions for some but not all of its employees performing covered work." Am. Compl., ¶ 19, ECF No. 12, PageID.68. It also alleges that Rieth-Riley "may owe additional money to the Funds based on other work performed" by its employees or subcontractors, the amount of which can only be determined by an audit. *Ibid.* In their amended complaint, the Funds ask the Court to compel Rieth-Riley to produce its books and records "for covered work from dates requested through the date of the audit," pay all fringe benefit contributions determined by audit to be owed, and award interest, attorney's fees, and other miscellaneous relief. *Id.* at PageID.70-72.

On August 25, 2020, Rieth-Riley filed a motion to dismiss the complaint for lack of subject matter jurisdiction. The Court granted the motion and dismissed the complaint without prejudice. Although it found that Rieth-Riley manifested an intent to continue operating under the Road Agreement, it concluded that the Funds unequivocally refused to continue operating under the

agreement after it expired and also refused negotiate a new CBA.  The Court further found that the

Funds only started accepting contributions from Rieth-Riley once they discovered that they

statutorily were obligated to do so.  Concluding that Rieth-Riley's obligation to maintain the status

quo for fringe benefit contributions arose solely from the NLRA, the Court determined that the

NLRB has exclusive jurisdiction over the Funds' claims.  *Rieth-Riley*, 517 F. Supp. 3d at 683-8.

On appeal, the Sixth Circuit reversed, holding that the question of whether a live contract

exists goes to the merits of an ERISA action and not a court's jurisdiction to hear it.  The court of

appeals did not disturb any of the Court's factual findings, however, and reasoned "the Funds'

contract claims may fall flat for the reasons the district court gave."  And it found that the Funds

forfeited their LMRA section 301 claim by failing to argue or develop it on appeal.  The court of

appeals remanded the case "for proceedings consistent with" its opinion.  *Rieth-Riley*, 43 F.4th at

619, 623-24.

Thereafter, the parties filed the cross motions for summary judgment.

## II.

For openers, Reith-Riley argues that the Court's prior findings on the non-existence of a

contract are the law of the case and that nothing has changed to disturb them.  That is not correct.

The Court made factual findings in the context of a jurisdictional challenge, as it is allowed to do

when assessing subject matter jurisdiction.  *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co*.,

491 F.3d 320, 330 (6th Cir. 2007) (holding that courts have "wide discretion" to consider affidavits

and documents "to arrive at the factual predicate that subject-matter jurisdiction does or does not

exist").  At this stage of the case, the Court cannot make factual findings.  *Shumate v. City of*

*Adrian, Michigan*, 44 F.4th 427, 438 (6th Cir. 2022) (reiterating that "[a]t the summary judgment

stage, courts are required to 'view the facts and draw reasonable inferences in "the light most

favorable to the party opposing the summary judgment motion""") (quoting *Scott v. Harris*, 550 U.S. 372, 378 (2007)).

Furthermore, when applied horizontally — that is, to earlier decisions of the same court in the same case — the law of the case doctrine is prudential, not jurisdictional. *Medical Center at Elizabeth Place, LLC v. Atrium Health System*, 922 F.3d 713, 733-34 (6th Cir. 2019) (Sutton, J., concurring); *Rosales-Garcia v. Holland*, 322 F.3d 386, 398 n.11 (6th Cir. 2003). The Court therefore retains the discretion to evaluate the discovery record at this stage of the litigation. *Ibid.*; *see also Hanover Ins. Co. v. Am. Eng'g Co.*, 105 F.3d 306, 312 (6th Cir. 1997) ("[T]his 'law of the case' doctrine is 'directed to a court's common sense' and is not an 'inexorable command.'" (quoting *Petition of U.S. Steel Corp.*, 479 F.2d 489, 493 (6th Cir. 1973)).

Nor does the fact that the parties have filed cross-motions for summary judgment automatically justify the conclusion that there are no facts in dispute. *Parks v. LaFace Records*, 329 F.3d 437, 444 (6th Cir. 2003) ("The fact that the parties have filed cross-motions for summary judgment does not mean, of course, that summary judgment for one side or the other is necessarily appropriate."). Instead, the Court must apply the well-recognized summary judgment standard when deciding cross motions: the Court "must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003); Fed. R. Civ. P. 56(c).

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To repeat, when reviewing the motion record, "[t]he court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that

one party must prevail as a matter of law.'" *Alexander v. CareSource*, 576 F.3d 551, 557-58 (6th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

The party bringing the summary judgment motion must inform the court of the basis for its motion and identify portions of the record that demonstrate that no material facts are genuinely in dispute. *Alexander*, 576 F.3d at 558 (citing *Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002)). "Once that occurs, the party opposing the motion then may not 'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Ibid.* (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)).

"[T]he party opposing the summary judgment motion must do more than simply show that there is some 'metaphysical doubt as to the material facts.'" *Highland Capital, Inc. v. Franklin Nat'l Bank*, 350 F.3d 558, 564 (6th Cir. 2003) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Instead, that party must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for" that party. *Anderson*, 477 U.S. at 252. If the non-moving party, after sufficient opportunity for discovery, is unable to meet its burden of proof, summary judgment clearly is proper. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

When challenged, the party who bears the burden of proof must present a jury question as to each element of its claim. *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000). Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir. 1991). It

must be emphasized, however, that when "evaluating the evidence, [the court] 'draw[s] all reasonable inferences therefrom in a light most favorable to the non-moving party.'" *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003) (quoting *PDV Midwest Ref., L.L.C. v. Armada Oil & Gas Co.*, 305 F.3d 498, 505 (6th Cir. 2002)).

The law has not changed since the last round of motions.  ERISA governs employee benefit funds, regulates their maintenance, and protects workers' interests in them.  *See* 29 U.S.C. § 1001(a).  ERISA offers a federal vehicle for contract claims arising out of an employer's failure to make a "promised contribution" to an employee benefit fund.  *Rieth-Riley Constr. Co.*, 43 F.4th at 619-20 (citing *Laborers Health & Welfare Tr. Fund for N. Cal. v. Advanced Lightweight Concrete Co.*, 484 U.S. 539, 549 (1988)).  Section 515 of ERISA tells employers to "make [] contributions in accordance with the terms and conditions of [the] plan or [] agreement."  *Ibid.* (quoting 29 U.S.C. § 1145).  Section 502(g) "gives funds a cause of action to enforce § 515's duties against 'employers who are delinquent in meeting their contractual obligations.'"  *Ibid.* (quoting *Advanced Lightweight*, 484 U.S. at 547).  And section 502(e) "vests 'district courts of the United States' with 'exclusive jurisdiction' to hear a fund's ERISA claim."  *Ibid.* (quoting 29 U.S.C. § 1132(e)(1)).

However, where the contract at issue is a collective bargaining agreement, the National Labor Relations Act (NLRA) also comes into play.  That statute "tells employers and unions they must bargain 'in good faith with respect to wages, hours, and other terms and conditions of employment.'" *Ibid.* (quoting 29 U.S.C. § 158(d)).  And it requires unions and employers to "freez[e] the status quo" and "honor the terms and conditions of an expired collective bargaining agreement" as they negotiate a new one, *Advanced Lightweight*, 484 U.S. at 539 n.6 (internal quotation marks omitted).  "Put another way, even when an employer has no contractual duty to

contribute to a fund, the NLRA imposes a statutory duty during a status quo period." *Rieth-Riley*, 43 F.4th at 619.

"When an employer 'effects a unilateral change' to the status quo — say, by halting its contribution payments — it commits an 'unfair labor practice' under § 8 of the NLRA." *Ibid.* (quoting *Litton Financial Printing Div. v. NLRB*, 501 U.S. 190, 198 (1991); *see also NLRB v. Katz*, 369 U.S. 736 (1962)); 29 U.S.C. § 158(a)(5).  And "'activity arguably subject to'" section 8 of the NLRA "comes within the 'primary,' and often 'exclusive,' jurisdiction of the National Labor Relations Board (NLRB)." *Ibid.* (quoting *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 245-46 (1959)).  Thus,

> [w]hen an employer stops contributing to an employee benefit fund, the where and how of any remedial lawsuit will depend on the source of the employer's contribution duty.  If the duty stems from a live contract, ERISA gives funds a claim for delinquent contributions in federal district court.  But if the duty comes from the employer's statutory obligation to maintain the status quo, the NLRA provides an unfair-labor-practices claim in the NLRB.

*Id.* at 620; *see also Laborers Health and Welfare Tr. Fund for N. Cal. v. Advanced Lightweight Concrete Co., Inc.,* 484 U.S. 539, 549 (1988) (holding that ERISA "does not confer jurisdiction on district courts to determine whether an employer's unilateral decision to refuse to make postcontract contributions constitutes a violation of the NLRA").

Reith-Riley contends that no contract exists between the parties because the plaintiffs refused to form one.  It maintains that its contributory obligations to the plaintiffs arise only under section 8(a)(5) of the NLRA, and the plaintiffs' claims for contributions and an audit exclusively belong before the NLRB.

Reith-Riley also argues that no implied contract exists between the parties, because it is legally impossible for an employer to form a labor agreement without the mutual assent of a union. Although the defendant expressed an intent to be bound by the expired CBA, it maintains that the

plaintiffs unequivocally refused to do the same.  It points to the union's and plaintiffs' consistent and repeated rejection of its offers to extend the CBA or negotiate a new one, and to the return of the defendant's post-expiration contributions.  Although the plaintiffs eventually began accepting the contributions, Reith-Riley points to evidence that the Funds' reversal of its position was based on their acknowledgement of their statutory obligation and not to any contract.  Therefore, it reasons, the plaintiffs have no enforceable claim against it under ERISA.

The Funds first suggest that they have an enforceable right to audit the defendant under ERISA and the common law of trusts.  Next, they argue that they may enforce the Road Agreement's audit provisions to audit documents generated before the agreement expired, contending that their amended complaint encompasses a demand for an audit for dates preceding June 1, 2018.  Finally, the Funds maintain that the parties expressly agreed to be bound by the expired Road Agreement each time the Funds accepted the defendant's contributions and fringe benefits reports, which included clauses stating that the contributions were made in accordance with the defendant's obligations under the CBA and the Trust Agreements.  And although they acknowledge that they first rejected the defendant's contributions, they explain that their rejections were based on a mutual mistake and maintain that the parties thereafter mutually assented to be bound.  The Funds also insist that the Trust Agreements and Policy on Payments alone were sufficient to require the defendant to submit to an audit.  They argue that the defendant agreed to abide by the Trust Agreements hundreds of times, in each of its fringe benefit reports, all of which expressly incorporated the Road and Trust Agreements.  They also say that the Policy on Payments provides for an audit "at any time," which must apply after the expiration of the CBA.

A.

The evidence does not support an inference that any contract existed beyond the stated durational terms of the CBA or that the parties mutually agreed to be bound by the expired CBA. Federal courts must apply federal common law to determine whether a collective bargaining agreement has been reached. *Sheet Metal Emps. Indus. v. Absolut Balancing Co.*, 830 F.3d 358, 362-63 (6th Cir. 2016). It is true that "a 'collective bargaining agreement is not an ordinary contract,' and '[t]he rule is well established that technical rules of contract do not control whether a collective bargaining agreement has been reached.'" *Ibid.* (quoting *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 550 (1964); *Pepsi-Cola Bottling Co. of Mason City, Iowa v. NLRB*, 659 F.2d 87, 89 (8th Cir. 1981)). However, "[a] meeting of the minds of the parties must occur before a labor contract is created." *Bobbie Brooks, Inc. v. Int'l Ladies' Garment Workers Union*, 835 F.2d 1164, 1168 (6th Cir. 1987) (citing *Interprint Co.*, 273 NLRB 1863 (1985)).

A writing is not necessary to form or extend a CBA; "it can be shown by conduct manifesting an intention to abide by agreed-upon terms." *Bobbie Brooks*, 835 F.2d at 1168. But a meeting of the minds is essential. *Ibid.*; *see also Hercules Inc. v. United States*, 516 U.S. 417, 424 (1996) (holding that an implied-in-fact contract is "founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in light of the surrounding circumstances, their tacit understanding.").

"Generally, an employer's contractual obligations under a collective bargaining agreement cease upon termination of the agreement. Exceptions to this general rule are determined by rules of contract interpretation." *Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., Loc. Union 1199 v. Pepsi-Cola Gen. Bottlers, Inc.*, 958 F.2d 1331, 1334 (6th Cir. 1992) (citing *Litton Financial*, 501 U.S. at 207). That includes the principle that "an expired contract has by its

own terms released all its parties from their respective contractual obligations, except obligations already fixed under the contract but as yet unsatisfied." *Litton Financial*, 501 U.S. at 206. Therefore, although by virtue of the statutory status-quo obligation most terms and conditions of employment are not subject to unilateral change after a contract expires, "in order to protect the statutory right to bargain, those terms and conditions no longer have force by virtue of the contract." *Ibid.* In other words, an expired collective bargaining agreement "is no longer a legally enforceable document." *Ibid.* (quoting *Office and Professional Employees Ins. Trust Fund v. Laborers Funds Administrative Office of Northern California, Inc*., 783 F.2d 919, 922 (9th Cir. 1986)).

As the record clearly demonstrates, Rieth-Riley unequivocally expressed a desire to extend and operate under the expired Road Agreement. It continued paying fringe benefit contributions, it sought to negotiate a new collective bargaining agreement, and it offered its "Assent of Participation" so it could "remain a party [to the CBA] in the same manner and form as any other participating employer." Assent Letter, ECF No. 76-13, PageID.2747. Those facts remain undisputed.

But in its earlier opinion, the Court found that, "in its attempt to continue operating under the expired CBA with Local 324, Rieth-Riley was an unrequited suitor." *Rieth-Riley*, 517 F. Supp. 3d at 683. The Funds have offered no evidence to disturb that finding on remand. There are no facts in this record suggesting even remotely that the plaintiffs shared Rieth-Riley's desire to continue under the expired Road Agreement. To the contrary, all the evidence still demonstrates the Funds' unequivocal rejection of that offer. The record reflects (and the plaintiffs concede) that the union refused to renegotiate a CBA with MITA or Rieth-Riley, rejected the "Assent of Participation" as "unilaterally created by MITA," and rejected both MITA's and Rieth-Riley's

attempts to bargain.  It also reflects (and the plaintiffs also concede) that the Funds rejected Rieth-Riley's attempts to contribute to the Funds until they discovered that the NLRA required them to accept the payments.  The Funds informed Rieth-Riley that they only would accept fringe contributions from contractors under CBAs "**which have not terminated**," and rejected payments as late as November 2018 — more than a month after it learned about the section 9(a) relationship. Return Letters, ECF No. 76-9, PageID.2562-65 (emphasis in original); Oct. 2018 Letter, ECF No. 76-17, PageID.2955.  In November 2018, the Funds' counsel also informed the *Thompson* court that they had decided they were accepting contributions "as a result of this 9(a) relationship," under which "the employer has the obligation to maintain the status quo . . . that was in effect prior to the termination of the agreement."  Mot. Hr'g Tr. in *Thompson*, ECF No. 76-10, PageID.2611-12. The plaintiffs' newfound insistence that they assented to enter a new CBA as soon as they resolved "the 8(f)/9(a) issue" is highly disingenuous.  *See* Resp. to Def. MSJ, ECF No. 82, PageID.4033 n.6.  The plaintiffs plainly understood that their obligation to accept the contributions arose *despite* their refusal to contract with the defendant.

The Funds nevertheless maintain that their belated acceptance of the fringe benefit contributions constituted their acceptance of Rieth-Riley's offer to remain bound by the expired CBA.  It is true that Rieth-Riley continued to submit fringe benefit reports that included boilerplate language referencing "the current applicable Collective Bargaining Agreements," and that the Funds eventually accepted the payments associated with those reports.  But as discussed above, the Funds actually *rejected* the contributions and reports until they discovered they were statutorily obligated to accept them under the NLRA.  And once the Funds began accepting the contributions, Rieth-Riley's compliance with the statutory status quo obligations did not create an implied contract.  *See Smith v. Candler Coffee Corp.*, No. 95-1095, 1996 WL 434554, at *4 (S.D.N.Y.

Aug. 2, 1996) (noting that if mere compliance with the NLRA's status quo obligations created an implied CBA, an employer would always face the "Hobson's choice" of "violat[ing] the law by halting contributions, or . . . creat[ing] an implied contract by continuing those contributions."); *see also Dugan v. R.J. Corman R. Co.*, 344 F.3d 662, 669 (7th Cir. 2003) (noting that because under section 9(a), the employer "was obligated by the National Labor Relations Act to maintain the status quo, and the status quo included making contributions required by the expired collective bargaining agreement," it "follows that the continued contributions may not even have been voluntary on [the employer]'s part, and if they were involuntary they certainly were not an acknowledgment of a contractual obligation"). After all, "it is not Rieth-Riley's conduct that is critical for the determination" of whether a contract formed; "it is the plaintiffs', and the union's." *Rieth-Riley*, 517 F. Supp. 3d at 684.

The plaintiffs still rely on *Michigan Bricklayers v. Northwest Construction, Inc*., 116 F.3d 1480, 1997 WL 351296 (6th Cir. 1997), and *Central States, Southeast and Southwest Areas Pension Fund v. Behnke*, 883 F.2d 454 (6th Cir. 1989), for the proposition that an employer may bind itself to an expired collective bargaining agreement by making certified contributions to benefit funds. But the Court already distinguished both cases in its prior opinion on the Rule 12(b)(1) motion, and the plaintiffs do not offer good cause for viewing those cases differently now. In *Bricklayers*, the court of appeals found that similarly-situated parties resurrected their CBA through conduct evincing intent to be bound by the expired agreement. *Bricklayers*, 1997 WL 351296, at *3. However, in reaching that finding, the *Bricklayers* court relied upon evidence that the union and its member employees believed that all parties were complying with the expired CBA. *Ibid*. There is no such evidence in this case. And in *Behnke*, the employer signed an "interim" contribution agreement during the negotiation period for a new CBA after the underlying

- 21 -

agreement expired. *Behnke*, 883 F.2d at 456-57. Here, the union refused to sign a similar agreement, and the other ancillary agreements at issue — the Trust Agreements — were signed more than two decades before the CBA expired. *See, e.g.*, Pension Fund Agreement, ECR No. 77-2, PageID.3437. Moreover, the Trust Agreements define who are covered by the CBA and require employers to comply with the policies and procedures of the Funds. Without a live CBA, the Trust Agreements are "incognizable," because they "depend wholly" on the existence of an enforceable collective bargaining agreement. *Cent. States, Se. & Sw. Areas Pension Fund v. General Materials, Inc.*, 535 F.3d 506, 509 (6th Cir. 2008); *see also Rieth-Riley Constr. Co*., 517 F. Supp. 3d at 684-86 (distinguishing *Bricklayers* and *Behnke*).

The plaintiffs also point to their Policy on Payments, which they say requires employers to submit to audits "at any time." *See* Payment Policy, ECF No. 77-8, PageID.3613. But the Funds adopted the policy on December 10, 2018, after the CBA expired, and Rieth-Riley never signed it. *Ibid.* at PageID.3615. And the Policy on Payments likewise "cannot be understood apart from" the CBA, *General Materials*, 535 F.3d at 509, because it sets out additional procedures for making fringe benefit contributions and conducting audits under the Road Agreement, Payment Policy, ECF No. 77-8, PageID.3611-15. Nothing about this one-sided document suggests that the parties mutually assented to contract.

As a last resort, the plaintiffs contend that the parties' shared misunderstanding that they had a section 8(f) relationship negates any actions the Funds took to repudiate the defendant's offer to contract. They insist that their refusal to enter a contract should be "without logical or legal significance," in the same way that a contract entered into under a mutual mistake of fact is void or voidable. However, although contracts sometimes may be rescinded on the basis of mutual mistake, *see, e.g.*, *Cincinnati, I. & W.R. Co. v. Indianapolis Union Ry. Co*., 36 F.2d 323, 324 (6th

Cir. 1929), they cannot be *formed* by virtue of mistake alone, *see Trs. of Mich. Reg'l Council of Carpenters Emp. Benefits Fund v. Fox Brothers Co*., No. 05-70262, 2005 WL 8155051, at *11 (E.D. Mich. May 23, 2005) ("Collectively bargained agreements emerge as the result of mutual assent and not legal compulsion.") (citing *H.K. Porter Co. v. NLRB*, 397 U.S. 99, 108 (1970)). The Court lacks the power impose a contract on the parties solely because the plaintiffs mistakenly believed that they could not enter one, and the plaintiffs have cited no authority stating otherwise. There was no mistake about the parties having a contract in this case.

Contracts require mutual assent.  On this record, no jury reasonably could find that the parties mutually assented to enter an express or implied CBA after the Road Agreement expired.

### B.

Likewise, there is no genuine question of material fact as to whether the audit provisions in the Trust Agreements survived the termination of the CBA.  They didn't.  After the CBA expired, Rieth-Riley no longer was bound to submit to audits seeking review of documents generated after the termination of the Road Agreement.

The Funds do not argue that the Road Agreement provides for the audit provisions to survive by its own terms — they do not identify anything in the text of the agreement or the record that suggests that the parties intended for the audit provisions to remain in force post-termination. Instead, the Funds maintain that the audit provisions in the Trust Agreements must survive the Road Agreement as a matter of law.  To support this proposition, the plaintiffs rely heavily on *Rudd v. Baker Furniture*, 967 F. Supp. 984, 989 (M.D. Tenn. 1997), a case that also involved an audit demand made by a benefit fund under an expired CBA.  There, the fund argued that, unless the right to an audit survives the expiration of a collective bargaining agreement, "trustees would have no effective way of exercising the right since an audit can only be performed in retrospect."

- 23 -

*Id.* at 988.  The *Rudd* court appeared to agree, finding "the policy rationale for a retroactive right to an audit . . . to be in line with ERISA's purposes" of ensuring that employers make all contributions due to trust funds and ensuring that trustees have adequate information to perform their fiduciary duties.  *Id.* at 989 (citing *Bldg. Serv. Emps. Pension Tr. v. Horsemen's Quarter Horse Racing Ass'n*, 609 F. Supp. 1075 (N.D Cal. 1985)).  However, it did not hold that all audit provisions necessarily survive CBAs.  Rather, the court reasoned that because "authority is limited on this issue," the plaintiff had alleged a set of facts that, if proven, "would afford an arguable basis in law for the claim made."  *Id.* At 990.  The court then denied the defendant's motion to dismiss for lack of subject matter jurisdiction, which was premised on the lack of an active collective bargaining agreement.  *Ibid.*

In deciding the motion to dismiss, the *Rudd* court relied in large part on the district court's reasoning in *Horsemen's Quarter*, one of the only other cases to consider whether audit rights survive the termination of collective bargaining agreements.  There, "trustees sought to audit the records of former union members who had opted for early retirement and were suspected of receiving pension benefits but had subsequently returned to work."  *Id.* at 899 (citing *Horsemen's Quarter*, 609 F. Supp. at 1078).  The district court found that the employer's duty to provide information to the trust "should not end upon the expiration of the collective bargaining agreement" in light of ERISA's purpose "to protect the pension benefits of those individuals who are entitled to them," and "to enable the Trustees to have adequate information to perform their fiduciary duties in collecting, administering, and paying out benefits.'"  *Horsemen's Quarter*, 609 F. Supp. at 1080-81.  It found, therefore, that the employer was obliged to produce the employment records requested by the trust.  *Ibid.*

Although both *Rudd* and *Horsemen's Quarter* found that trustees could enforce audit provisions in expired CBAs, neither held that audit provisions always must survive the termination of a CBA as a matter of law.  Rather, both decisions are premised on the policy goals of ERISA as applied to routine requests for audits covered during the pendency of collective bargaining agreements.  *See Rudd*, 967 F. Supp. at 989 ("Plaintiff argues that the Fund does not seek to audit for any periods following the expiration of the collective bargaining agreement nor to collect the contributions for any period following the expiration of the collective bargaining agreement."); *Horsemen's Quarter*, 609 F. Supp. at 1080 (distinguishing the records request at issue from those seeking information "*never* covered by the collective bargaining agreements").

Those facts distinguish the cases from this one, where the Funds demand to audit materials generated after the Road Agreement expired.  The Funds' demand lists audit periods for three locations starting June 2018 and indicates that the Funds are requesting records for all locations through October 1, 2019.  Audit Demand, ECF No. 77-10, PageID.3663.  And the plaintiffs brought this action to determine the defendant's "indebtedness to the Funds for work performed by its employees *from August 1, 2019 onward* when Defendant began selectively paying contributions for some but not all of its employees performing covered work."  Am. Compl., ¶ 19, ECF No. 12, PageID.68 (emphasis added).  The amended complaint expressly alleges that the defendant began owing contributions as of that date, *ibid.*, and that the defendant's obligation to make the contributions stems from its adoption of the expired collective bargaining agreement, *id.* at ¶ 17, PageID.66.  And the Funds' director stated in a declaration that Rieth-Riley "began not paying fringe benefit contributions" for some employees "after August 1, 2019."  LaLonde 2020 decl., ¶ 18, ECF No. 77-11, PageID.3668.  The plaintiffs plainly demand an audit to seek records generated, and to enforce rights purportedly accrued, after the Road Agreement expired.

The Funds suggest that the Court nevertheless should bifurcate their audit request, so that they may proceed to demand all information requested for periods before June 1, 2018 independently of any later-generated records.  *See* Resp. to Def. MSJ, ECF No. 82, PageID.4028-29.  But that is not the audit the plaintiffs requested in their pleadings.  Nor have they ever construed their demand as a random audit made under the Trust Agreements' provisions that Funds may select an employer for audit at any time.  *See, e.g.*, Pension Fund Agreement, Art. I, 77-2. PageID.3456.  To the contrary, until now, the Funds have framed their audit demand exclusively in terms of investigating Reith-Riley's alleged delinquency that arose after August 1, 2019.

The plaintiffs' novel legal questions — their proposed bifurcation — is best addressed by the "ordinary principles of contract law."  *M & G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 435 (2015).  It is well-established that courts are prohibited from extending terms beyond the expiration of a CBA absent evidence that the parties intended the terms to survive the agreement. *Litton Financial*, 501 U.S. at 207-08.  Granting the Funds the relief sought in the amended complaint — an audit of documents generated *through the date of the audit* — would require the Court to extend the audit provisions of the Trust Agreements beyond the termination of the Road Agreement.  Again, there are no "explicit terms" in any of the agreements that the audit provisions continue after their expiration, or any other evidence in the record that creates a fact question as to whether the parties intended for the audit provisions to apply to records generated after MITA terminated the CBA.  *Ibid.*

That is not to say that the defendant's section 9(a) status quo obligations do not include a responsibility to continue complying with the audit provisions.  The failure to submit to an audit request after an expired CBA may constitute an unfair labor practice under section 8(a)(5) of the NLRA. *See Com. Prop. Servs., Inc. & Bldg. Serv. Loc. 47 Cleaning Contractors Pension Plan &*

*Its Trs. & Its Loc. 47 Welfare Fund No. 1 & Its Trs.*, 304 NLRB 134, 135 (1991).  But that is a question for the NLRB, and not a matter for this Court.  *Advanced Lightweight*, 484 U.S. at 552.

Because no jury could find that the parties agreed to extend the audit provisions beyond June 1, 2018, the Funds are not entitled to summary judgment on their claim for a pre-expiration audit.

C.

Last, the Funds assert that ERISA provides them a freestanding right to demand to audit contributing employers.  This argument is not clearly stated; it may be that the Funds merely are reiterating the principle that ERISA authorizes benefit funds to conduct audits as part of their mandate to monitor and enforce the contribution obligations of employers.  That proposition is undisputed.  However, if the Funds contend that they have an inherent right to audit the defendant, independent of the parties' collective bargaining agreement, that is a different matter.

The plaintiffs cite *Central States, Southeast and Southwest Areas Pension Fund v. Central Transport, Inc.*, 472 U.S. 559 (1985), in support of this amorphous argument.  *Central Transport* concerned the scope of audits employers must submit to under ERISA, an issue that arose in the context of a collective bargaining agreement and trust fund agreements that provided a benefit fund the right to audit an employer.  *Id.* at 563.  The employer objected to submitting to any audit involving records of employees who the employer denied participated in the relevant multiemployer benefit plan.  *Ibid*.  The Supreme Court held that fund had a right to perform the requested audit, because it was "well within the authority of the trustees as outlined in the trust documents," and the policy framework of ERISA.  *Id.* at 574, 581.  However, the Court grounded its opinion in the parties' collective-bargaining and trust agreements, *id.* at 565, expressly cautioning that

- 27 -

we do not hold that under ERISA a benefit plan's interests in fully identifying participants and beneficiaries *require* that it conduct the sort of audit in question. This case involves only the trustees' *right* to conduct this particular kind of audit program, not their *duty* to do so. Second, we have no occasion to determine whether ERISA would independently confer on the trustees a right to perform the sort of audit demanded in this case in the face of trust documents that explicitly limit the audit powers of trustees.

*Id.* at 581.

*Central Transport* confirms that a fund's audit rights, if any, are created and defined by contracts. And no jury reasonably could find that a live contract obliged Rieth-Riley to submit to the plaintiffs' demanded audit, for the reasons stated above.

## D.

In its last gasp, the Funds point to its amended complaint and the mention of a claim under the Labor Management Relations Act, which the court of appeals said they abandoned and therefore forfeited. *Rieth-Riley*, 43 F.4th at 621 n.1. That finding was entirely understandable, as the Funds never developed an argument based on the LRMA here before the appeal or in the court of appeals. The Funds now maintain that they only waived their LMRA claims for purposes of the prior appeal and still may assert them here.

There is some question whether the LMRA claim is still in play. The court of appeals held that the Funds forfeited their LMRA claims and then remanded the case "for proceedings consistent with this opinion." 43 F.4th at 624. The mandate rule "requires lower courts to adhere to the commands of a superior court." *United States v. Mendez*, 498 F.3d 423, 426 (6th Cir. 2007) (quoting *United States v. Moored*, 38 F.3d 1419, 1421 (6th Cir. 1994)). Therefore, "[u]pon remand of a case for further proceedings after a decision by the appellate court, the trial court must 'proceed in accordance with the mandate and the law of the case as established on appeal.' The trial court must 'implement both the letter and the spirit of the mandate, taking into account the appellate

court's opinion and the circumstances it embraces.'" *Moored*, 38 F.3d at 1421 (quoting *United States v. Kikumura*, 947 F.2d 72, 76 (3d Cir. 1991)).   A district court may, however, consider "those issues not decided expressly or impliedly by the appellate court."   *Allard Ent., Inc. v. Advanced Prog. Res., Inc.*, 249 F.3d 564, 570 (6th Cir. 2001).

It must be remembered, though, that a "lower court 'is bound by the decree [of a higher court] as the law of the case, and must carry it into execution according to the mandate.'"   *Medical Center*, 922 F.3d at 733 (Sutton, J., concurring) (quoting *In re Sanford Fork & Tool Co.*, 160 U.S. 247, 255 (1895)); *see also United States v. Haynes*, 468 F.3d 422, 426 (6th Cir. 2006) ("Determinations by a Court of Appeals become the law of the case and are binding on both the district court on remand and the Court of Appeals upon subsequent appeal.").

Applied here, the mandate rule requires the Court to abide by the Sixth Circuit's finding that the Funds forfeited their LMRA claim.   The court of appeals was not ambiguous; it expressly stated that "the Funds make no real attempt to develop their LMRA argument" and thus found that "they forfeit it."   *Rieth-Riley*, 43 F.4th at 621 n.1.   And nothing in its opinion suggests that the Funds may assert their LMRA claims again on remand.   To the contrary, the remainder of the Sixth Circuit's decision focuses entirely on the Funds' Section 515 ERISA claim.   Because the court of appeals remanded the case for proceedings consistent with that opinion, *id.* at 624, the Funds may not pursue their LMRA claim on remand.

Moreover, the Funds' claims under the LRMA, like their claims under ERISA, are dependent on the existence of a contract.   *See Orrand v. Scassa Asphalt, Inc.*, 794 F.3d 556, 561-62 (6th Cir. 2015) (observing that "the writing requirement is further reinforced by Section 302 of the LMRA, 29 U.S.C. § 186(a), which bars an employer from contributing to benefit trusts designated by employee representatives unless the payments are 'made in accordance with a

written agreement with the employer'") (quoting *Behnke, Inc.,* 883 F.2d at 459; 29 U.S.C. § 186(c)(5)(B)).  Because there is no continuing contract, express or implied, the Funds could not prevail on their LMRA claims even if they had not forfeited them.

III.

The undisputed evidence in the record establishes that there is no live, enforceable contract in place that can serve as a basis for the plaintiffs to maintain an action to demand an audit or for collection of fringe benefit contributions from the defendant under ERISA or the LMRA. Furthermore, the plaintiffs forfeited their LMRA claim.  And there is no genuine question of material fact that the defendant's obligation to make contributions arises, if at all, from the mandate in the NLRA to maintain the status quo during the interregnum between the expired CBA and the to-be negotiated successor.

Accordingly, it is **ORDERED** that the defendant's motion for summary judgment (ECF No. 75) is **GRANTED**, and the plaintiffs' motion for summary judgment (ECF No. 77) is **DENIED**.

It is further **ORDERED** that the amended complaint is **DISMISSED WITH PREJUDICE.**

s/David M. Lawson       <br>DAVID M. LAWSON<br>United States District Judge

Dated:  July 6, 2023